and CDP 2022-1392. Mr. Croy. Thank you. Please proceed. Thank you. Good morning, your honors, and may it please the court. This court should reverse the judgment of the trial court because the text, structure, purpose, and history of section 2254 B-1B show that Congress took a neutral approach towards modifications which gave the president flexibility to meet the safeguard statute's remedial objectives, and at the very least show that the president did not clearly misconstrue the statute under the limited standard of review in proclamation 101-01. Numerous aspects of the statute evidence Congress's neutral and at times even trade-restrictive approach in the statute, starting with the language of section 2254 B-1B itself, which contains no explicit requirement along the lines of the one that the trial court and the appellees imply into the statute. Counsel, do you know of the canon of construction, if I pronounce it adequately, Nossator Asokii? One knows it by its friends? I have heard of that canon, your honor. Well, it is an established canon, and reduction and termination indicate lessening, so why doesn't modification have that same meaning? I think for several reasons. First of all, because there are two other uses of modifications just in that same provision, 2254 B-1B, that by their nature have to allow trade-restrictive modifications. I think one particularly stark one is the use of modification in the title. 2254 B's title is reduction, modification, and termination, so it has three things. Among the provisions in 2254 B is the circumvention provision, which is basically only about trade-restrictive changes, modifications to a safeguard measure. Because a trade-restrictive action under 2254 B cannot be a reduction and it cannot be a termination, it can only be a modification. Right there in that same provision, Congress is using modification in a way that has to connote both trade-restrictive and trade-reductive measures. Also, another sub-provision of that section, 2254 B-3, is the one that allows the President to take action to comply with the WTO decision. As we pointed out in our brief, and this hasn't really been disputed by plaintiffs, that could also be a trade-restrictive or trade-neutral modification. So that's right in the statute. And then I think there are several other reasons as well. One very important one is that Congress legislated, I'm sorry, I shouldn't skip past the WTO provision so quickly. If you're taking action with respect to an adverse WTO decision, you could loosen to comply with it, but there might be circumstances where you more restrict to comply with it, like adding countries to the measure in response to some claim of unequal treatment. I just want to make sure, that is a thing? The WTO could tell us that we've been too loose in trade and we need to restrict further? More or less, yes, but that's not what they would say. They would say you're acting in some unequal or unfair way. Maybe you haven't applied MFN, most favored nation status, or maybe you've excluded countries and the WTO would say that's unfair, you can't exclude NAFTA But the bottom line would be that the President would have to take action to make things more trade-restrictive in response to a WTO decision? He would not have to, but he could. He could say, I'm going to make this equal by bringing these countries in. And in fact, that's roughly analogous to what the President did in that wheat gluten proclamation that we cited as a historical example of trade-restrictive. There wasn't an unequal treatment thing, but Poland had become a larger producer of the product. And so after the ITC report, the President went and made a modification and said, I'm adding Poland, because they were out and now they should be in. I would be remiss, however, if I didn't also point out that Congress legislated 2254B, it didn't do so on a blank slate. There are two important aspects of legislative history to highlight here. The first is that the basic definition of modification under the statute, which is 19 U.S.C. 2481, subsection 6, we've described it as an open-ended definition. It basically says it can include elimination, but it doesn't say it can't include restriction. It's open-ended. The legislative history to that, which we've cited in our brief, is particularly important because that legislative history also evidences a neutral approach. Congress, the House report actually explicitly says, yes, you can have increases and decreases. The Senate report just uses the word change generically, again, consistent with the neutral approach. That is the grounds on which Congress legislated in 1988 when it added this provision. If it wanted to change that kind of neutral, open-ended definition of modification, it could have done so, but it didn't. That brings us to the second piece of legislative history that's really important here. The legislative history of the 1988 law itself, that added section 2254B1B, there's an important aspect of that legislative history that appellees leave out. Yes, there was a Senate provision that was originally going to make it restrictive, and that language was removed. We cited the Supreme Court principal, Rosello, Bates, other principals that say if Congress removes language, you have to take that seriously. It's presumed that Congress acted purposely, but what appellees leave out is that that language was removed because the provision was being combined with the House version of the legislation, which again, explicitly allowed the President to take action to, I'm going to quote it directly here, ensure the effectiveness of import relief and providing adequate opportunity for adjustment. The Senate was restrictive, the House bill went the other way, and Congress ultimately took that language out and left it as a neutral approach. The Court of International Trade seemed concerned that your reading would create a loophole that the President could exploit. Do you agree that it does create a loophole, and if not, what prevents it? No, not at all, and I think that's where the trial court respectfully went wrong, because even though the provisions of section 2254 do not prevent these kind of modest adjustments consistent with the Supreme Court's definition of modest being limited adjustments in MCI, there are ultimate constraints in the statute, principally contained in section 2254E. There's the E-5- 2253. 2253, excuse me. That's correct, that provision that allows the ratcheting down, phasing down over time. This provision, this modification, Proclamation 101, was consistent with that. Would it have been consistent if it wasn't USTR, but the President, who in 96-73 excluded double-sided panels? Hard to speculate, Your Honor, but I think that is important here that USTR was not, that the President was only restoring the status quo and, in fact, the President announced a plan of action in paragraph 12 of his original proclamation, 96-93, which said, if I determine- Does 2253, what is it, E-5, is that what we're talking about? Does that apply to any restrictive measure or only a subset, and would it apply to the kinds of products that are covered? I'm just asking now a statutory form of the question I previously asked. Suppose it wasn't USTR, but it was- Suppose it was the President, which it was not, that excluded the double-sided panels. To begin with, could the President then use the 2254 B-1B modification authority to add double-sided panels, even though he excluded them by hypothesis, contrary to fact, in the initial? Sure. I think it depends a little bit on the facts, but I think in Your Honor's scenario, the basic version of Your Honor's scenario, the circumvention provision, if they were excluded from the original measure, then I think you'd be in a circumvention circumstance where B-2 would come in, potentially, rather than B-1. The President, if the ITC has not even looked at that product, the President can't add a measure based on products that are not part of the ITC's investigation. If it was part of the ITC's investigation, and then the President somehow excluded it, that may change the circumstances, but the language of 2253 E-5 says the action, and consistent with this Court's approach in Trans-Pacific, for example, as later It's not just limited to tariffs. Right. It's the overall action has to pay down. And there are other provisions. The 2253 also prevents the President from raising tariffs more than 50%, I think, of the existing rate, or maybe it's above 50% overall. I think it's 50% of the existing rate. So all these are constraints. Is it always clear whether a particular action by the President is trade liberalizing or trade restricting? Or would you argue that part of the problem with the CIT interpretation is, we don't always know, we might get into debates about whether a particular action is restrictive or liberalizing? I think that point is well taken. And it also points out a flaw in Affili's position, because some of these actions that they claim are reductions or terminations, those are clearly things you'd want to do under the first subsection, B1A. But if they're only modifications and not reductions or terminations, then you wouldn't be able to do those things to reduce the measure. And that's another flaw in their argument. And of course, the why here is this case demonstrates why Congress would take a hands-off approach on this issue and understand that it would come out of the mid-term report. Because here, the ITC very much did find, this is page six of the February 2020 ITC Monitoring Report that is the trigger for the President's authority under the statute. They found that the industry had made a positive adjustment. But they found that that ongoing positive adjustment was being impaired by this major loophole that had developed through the bifacial exclusion. And so we're not the ones proposing a loophole. It's the bifacial exclusion that was a loophole. And it does seem somewhat absurd that the President would not be able to fix a loophole that's essentially created with his own delegated authority in a safeguard measure in a way that everyone seemed to agree was impairing the effectiveness of the measure. Can I ask you about one of the, I guess there's three alternative grounds that are asserted on appeal that the trade court rejected. I want to ask you about one of them. And that is the question whether the, what's it called, a petition, is that right? The petitioner who says, we would like you to make a modification, whether the petition has to say, and by the way, we're making progress. Here, I'm not distinguishing between making progress and, you know, reach the promised land. Does the petition have to say that? And I think it's undisputed here that the thing, the three letters that constitute the petitions here did not say that. Peculiar language of the statute. The statute does have peculiar language. I mean, vague. In your view, what does such refer to? The ITC report? The ITC report, because the president can only act after he receives the ITC report. It such as generally refers to something previous. We cited the Black's Law definition of that in this kind of pronoun form. But also it makes sense because why, if the president has the objective thorough report from the ITC, the industry's perceptions of its positive adjustment should be less important. The other thing that's worth noting here is that this point is slightly disingenuous. Because the president has in his hands the ITC's February 2020 monitoring report. Again, the trigger, the thing we think such refers to. You know, that involves significant advocacy from the parties. And there's a section of that report, Roman numeral seven. You look at pages 28 to 32 of that report, for example. I mean, these same domestic industry parties were arguing themselves pretty hoarse that they had made a positive adjustment to import competition, but were being impaired. They're into your rebuttal time. Okay, I will save the rest of my time for rebuttal, Your Honor. Thank you. Mr. Nicely, you're taking 12 minutes. Thank you, Your Honors. May it please the Court, I'm Matt Nicely of Akin Gump, appearing on behalf of Planeta Fapolese, Solar Energy Industries Association, or SIA and Nexterra Energy, Inc. Congress laid out specific statutory standards and requirements when a president seeks to make changes to a safeguard action, action which itself is extraordinary action, as it is imposed on all imports of a product for which no finding of unfair trade is lodged, where the president is required by statute to ensure that the economic and social benefits of the action outweigh the costs, and where any relief is phased down over the life of the action. The relevant statutory standards and requirements applicable here were not followed by President Trump when he issued Proclamation 10101. There are four grounds on which you can affirm the trade court's decision, any one of which is sufficient to uphold that court's decision. Can I just, one thing you said, I guess, caught my ear. You say that the phase-down or digression, I've never heard that word before, digression requirement applies to any action. So your answer to my question about what would have been the case had the two-sided panels been included in the original, I'm sorry, they were included in the original, had they not been, was that that kind of modification of bringing them in for the first time would have been prohibited by the phase-down requirement? Arguably, yes, Your Honor. That's not our situation here, but I think the government's answer to your question about the possibility of using the circumvention provision could be applicable. On the other hand, I could see a debate about that because you don't have an International Trade Commission decision finding serious injury with regard to those products. Obviously, the reason I'm asking this is that the trade court was concerned about too large a loophole for presidential impositions at the modification stage. And if the inclusion of new products was not among the things that he could do by virtue of the phase-down requirement, then the concern about loophole is, to that extent, lessened. It is perhaps, to that extent, lessened, yes. But there are other ways in which you can imagine going above the amount that was originally announced in terms of duties or the particular quota, et cetera. Let me ask you what I asked your friend on the other side. Is there not a general problem here with your interpretation that it's not always clear what is trade restrictive versus trade liberalizing? I think there are instances where you can, as the government has argued and in fact opened his words on, with the notion of something being neutral, right? Something could be you could have a quota that's set on an annual basis and turn it into a quarterly quota, for instance. And is that more or less? It's not always necessarily clear. But so, or you could change the nature of the restriction, maybe, I don't know, from a duty to a quota. To a quota, right. On your view, we're going to need fact-finding on all of those to determine whether the president can actually make that modification. Isn't that right? I think, ultimately, the question, if we can get into this, because I don't think it came up during the government's discussion, is whether it makes sense in the context of the specific provision that's at issue here, which is 204B1B. And I say that, and I draw your attention to that, because we are talking about a provision that is specifically triggered by the domestic industry itself coming forward with, by the way, no reference at all to the substance of the ITC's midterm report. Just the fact, temporally, that it has happened. He has to wait until that has happened, meaning that they have adjusted to import competition. Okay. That is adjusting to import competition is a term of art in the statute, in 201B, right. It specifically says in 201B1 that the domestic, that that means that the domestic industry is able to compete successfully with imports after actions taken under section 2254 of this title terminate. In other words, and it goes on to explain further, but that's the key phrase, right. If the industry has already made the adjustment to import competition, it makes no sense to interpret the word modify in that particular provision to mean that the president can make the relief even more restrictive than it was before. And clearly, in this instance, we are talking about something that's more restrictive. We have in two respects. Number one, the relief, as it was for bifacial panels, right. So you have the relief, in effect, at the time of the president's proclamation, 10101, was in fact. But it's not more restrictive if we go back to 9693. It's not. But having them back in just restores the status quo that the president put in place in the first. See, that's what we, that's what, your honor, that's what we argue is kind of an unusual approach that the government has taken here. They're basically telling you, don't worry, we promise we're never going to go above what we had in place before. And perhaps this goes to some extent to Judge Toronto's question, because the fact is we don't know how this could be interpreted in the future. The fact is that this could go above where it was before, because the way in which they're interpreting it, we don't know which way it could go. Well, I don't see how that's the case. You have the digression requirement, which requires, at least on a yearly basis, a phase down if duties are imposed, correct? That's in the statute. They're not suggesting they don't have to comply with that. Correct. But they haven't complied with it because they're taking a... That had not vested yet. We were not in the fourth year when the president did the modification. Isn't that entirely analogous to what happened in the Will case with judicial salary increases? I don't think so, your honor. In this case, what we're dealing with is an announcement, and I think you have to take the 201 statute and safeguard cases alone and look at the structure and the way the law works. There's an announcement that happens at the beginning when the original proclamation is issued, right? And there's very clearly an announcement about what the phase down is going to be. Companies make plans about that phase down in advance, right? Statute requires a midterm report from the ITC. Everybody knows that. Understood. And the president has modification power. He also has termination and reduction power. Industry, everybody knows that. Doesn't that imply there could be a change? But we're dealing... I'm sorry, your honor. But what we're dealing with is 204B1B. And I guess, let me make sure that I get to the important contextual arguments about... And Judge Lurie asked about this earlier, about the issue of the surrounding provisions, right? I mean, the fact is that the provision that's right before 204B1B specifically talks about the notion of reviewing that ITC report very, very carefully, consulting with commerce and labor secretaries, and talks about the possibility of changed economic circumstances. And even yet, in that situation, the Congress decided to deny the president the authority to increase, to make more restrictive the trade relief that was originally granted. But even if we agree with you that modification means lessening, is that... Was there a clear misconstruction of the statute? It seems to be arguable. Maybe that's not clear. I beg to differ, your honor. I think, in this instance, given the context of both 204B1A as well as 204B2, it does become clear. And the standards of... Canons of statutory construction that have been cited in all of our briefs make evident that even if a specific word might be that specifically allows for an increase, and they use language that made very clear that they allow for it, right? If they meant to allow for it in the context of 204B1B, even though the industry has come forward and said, we have already adjusted to import competition, even in that instance, you would think that they would have said so, they would have allowed it. What are the circumstances in the real world, not odd circumstances, but kind of normal circumstances, in which domestic industry comes in and says, please protect us less? I'm sorry, and I hear somebody laughing in the background, but it happens all the time. Yeah, that's what I want to understand. So the Harley-Davidson... Superficially, it raises a question. Understood. But the Harley-Davidson case back in 1988 is a good example where Harley-Davidson came forward and said, we're done. We don't want to dump anything in countervailing duty cases all the time, where companies come in and say, in fact, it happened in a couple of cases just in the last few months, where the industry comes forward and says, we are, through a changed circumstance review, where they come forward and they say, we no longer need this relief, okay? So there are examples. There may be lots of little details as to why those things might happen, but the fact is they do happen. Do those things happen when the domestic industry is also in process of selling a whole lot of imports, and so it now has a mixed interest, or...? That can happen, for sure. Yes, Your Honor, for sure. But that's not the only instance in which it happens. The point is, there are many examples of where companies decide... So when you look at the 2254B1A and B, A is where basically the domestic industry is not doing enough to make continuation worthwhile, and so the president can, say, eliminate or reduce. And B is where domestic industry is saying, in your view, which is now combining two arguments, that it has done well enough, and therefore, we don't need this anymore, as opposed to the second one being covering the waterfront of, we need more, and we're making progress, and we deserve it. With all due respect, Your Honor... That was not a skeptical question. I understand, but I do want to just correct one issue, which is that there's a second part to 204B1A. It's not merely when the industry is not doing enough. It's also, if you look at the 2254B1A in the whole, the effectiveness of the action taken under Section 2253 of this title has been impaired by changed economic circumstances. Right, or it's pointless. What's that? Or it's pointless. Well, not necessarily. I mean, if you look at the legislative history, they specifically use an example of where, for instance, exchange rates could change dramatically, diluting the effect of the duty, and therefore, perhaps, you would think in that That is exactly my point, Your Honor. The statute there doesn't allow it. Right, I'm trying to understand how these two pieces fit together. The first one is, is it undisputedly only liberalizing measures, BA? If you look at what I'll call the shoe, we've been joking about, we talk about the chapeau, what is the lower part? The shoe, where it says that changed circumstances warrant such reduction or termination at the very end of 204B1A, right? Right. So our assumption in reading that, and everybody in this Assuming we could always distinguish liberalizing versus non-liberalizing, A is only about you can do things to And then B, you want to say, is also about that, because it is very plausibly about a circumstance in which liberalizing could be supported in the absence of the A conditions, but it's still liberalizing. It's still liberalizing, yes. I mean, the government's view is B is not just about liberalizing. I understand that, but they're trying to shoehorn it in there because A doesn't permit it, right? And so for whatever reason, Congress didn't provide that. They denied the government the authority to do it in that context. Right, but you understand that your last couple of sentences don't advance the ball at all. We're trying to figure out which side is right about the interpretation by figuring out what the fair implications are from the things that are in the statute, and not what anybody's trying to do. They may be trying to do something they're entitled to, in which case, who cares what they're trying to do? I understand, but my explanation, though, is if you look again in context between both A and B-2, then it becomes evident that they would not have, if they had meant to allow a more trade-restrictive approach in 204-B-1-B, they would have said so in the same way they did in B-2, where the specific language that says that they're permitting themselves to make a change in the language that's specifically used in B-2 is to take such additional action, right? That take such additional action is, in essence, another way of saying to increase. So Congress knew how to say increase if they meant to increase, and they didn't say it. Just ask one more, sorry. Have you given us any examples of where we've found a clear misconstruction of the statute by the present act? I believe we have, based on context. Yes, your honor. No, I don't mean in this case. In any prior case. In any precedent where we have found that, a clear misconstruction. Any case before the Federal Circuit ever where you found the president making a clear misconstruction? That's the question. Well, off the top of my head, I cannot think of one right now, your honor, but it strikes me that you have an instance where the president was making decisions that are, in fact, clearly in... You think it's here, clearly. Yes, I do. I think it's here. We do have two other alternative arguments that we haven't had a chance to touch on, but we'll refer to our briefs. Thank you. Ms. Berman. Good morning, your honors. Amanda Berman on behalf of Appellees in Energy Renewables and EDF Renewables. And I want to address one of the three alternative arguments, and that is that the court can uphold the decision below on the independent ground that the president failed to make a determination that he is required by the statute to make before he takes any safeguard action. And that is the determination that the economic and social benefits of taking action outweigh the cost. The safeguard statute directs the president to make that determination not once, but three times. And critically, the first time is in the very first provision of the statute, section 201A, entitled Presidential Action, that sets the constraints for the president's general authority to take action. And I think that's really important, your honor, because that's why this is a cross-cutting requirement. It's not just a requirement when the government takes the initial safeguard action. Now, even in its reply brief, your honor, the government pointed, sorry, go ahead. So I guess I'm remembering, and you'll correct me if I'm remembering incorrectly or badly summarizing, but the trade court effectively said, or in any event could have said in slightly different words, that the president made an assessment at the outset in 96-73 about where the balance needs to be. Among several things, he then came along after a little bit of experience with the ITC report and said that balance is now out of whack, so I need some additional measures to restore that balance. Why isn't that, in some substance, a determination of the balance that the statute admittedly requires? Your honor, the notable thing about Proclamation 10101 is there is not a mention of economic costs or benefits at all, and that is in this entire string of solar safeguard actions, the prior presidential actions, the USTR's actions, all recognize that requirement to make that analysis and to make the determination. And I would point the court to President Biden's action when he extended the safeguard measure in Proclamation 10339, which makes the determination that is required under Section 201 of the statute. The only place we don't see that is Proclamation 10101, and I don't think you can fairly read it into that proclamation. You know, in that proclamation, there's repeated references to the impacts on the domestic manufacturing industry. Now, the court below pointed to the word... Do we have to read 10101 all by itself in a vacuum, or do we read it in connection with 96-93 and everything that happened up to that point of 10101? Your honor, 10101 is an independent presidential action, and so we would put forth, and I think you effectively want us to say, because it didn't have one clear sentence that said, yes, I've weighed the costs and benefits, benefits outweigh, if the president had just simply written that one sentence in, all would be fine? Your honor, this is not just a formulate magic words kind of thing. This is one of the core, two core purposes of the statute. But if you want us to judge that document, and just that document in a vacuum on its own, isn't that essentially a requirement of a certain formulation? If we don't see that sentence, then he's done. Your honor, yeah, it's a statutory prerequisite. He has to make the determination. The statute doesn't just say, weigh costs and benefits. It says, make a determination that the benefits outweigh the costs. And he didn't do that in this one action in 10101. And you can't read that from the word impairment. In fact, impairment is used in paragraph nine of 10101, and it is specifically linked right back to the impacts on the domestic industry. It says, impairment is the result of increasing imports of competing products. So everything in that document tells us that the president was thinking about one thing, and it's the impacts on domestic industry. And that makes sense because he was acting based on these three letters that only talked about impacts on domestic industry. But it's really important, your honor, that this cross-cutting constraint, and I heard government counsel refer to constraints earlier today. There's one of two constraints, and they recognize this in their reply brief on page six. And that is that you've got to make sure that what you're doing has greater economic and social benefits than costs, not just that it helps the domestic industry. That's only one of two cross-cutting purposes of the safeguard measure. So, your honors, I see that my time is out, and I would just say that, your honor, we do have a loophole problem here in conclusion. If the president is not held to this statutory requirement, and this is a case like GILDA where this court found that the executive branch acting through USTR had failed to make a determination required by the statute, and this is the 2006 GILDA case, same thing here. If the president is not held to this determination requirement, he can circumvent the purposes of the safeguard statute by taking action under this modification provision, regardless of the impact on, regardless of the social and economic costs and whether they are outweighed by the benefits. Can I just double check something? Do your clients or anybody on your side dispute the applicability of the clarity standard of statutory violation that we have said applies when it's the president's own action? Your honor, I don't think we have a standard of review dispute here, and that's because the government in its own brief cites to the motion systems case, it recognized that there has to be, that the president can't violate an explicit statutory mandate. So call it clear, call it explicit. This is 100% clear in the statute. The statute says it three times and uses particular words, make a determination. We don't have that determination. Do you mean by saying that to say something that I think feels different to me, which is that you have a word in the statute that might have a broad meaning, and in fact clearly does have a broad meaning, context-free, but that is argued to have a context-specific meaning reaching only a subset of, which is just modification is plainly a neutral term. The question is whether in context it is reading meant to apply only to a narrower thing. Both are explicit, that is the statute is explicit in using modification. Do you think that we have to find, or do you think we do not have to find that the fair reading of the statute as limited to the subset of liberalizing measures, or your other statutory arguments as well, have to be clear? Your Honor, as this court said in Trans-Pacific, it's this court's job to interpret statutory text de novo. So I think if this court decides that that's what the statute means, that's what the statute means. And in regard to this determination requirement, I don't think could be clearer, your argument. Make a determination that the social and economic benefits outweigh the cost. That is a very specific requirement. I can't think of clearer language. Thank you, counsel. Thank you, Your Honor. Mr. Kerlin, we'll give you five minutes for rebuttal since the other side went over. Thank you, Your Honors. I'd like to pick up right where counsel left off with this cost-benefit issue. I think there are two pretty The first is right at that did the President violate an explicit statutory mandate argument. There is not a word about cost-benefit analysis in Section 2254b1b. The appellees are implying that from other provisions of the statute, but there's a key provision of the statute that they don't refer to. This is particularly Section 2253a2. That is the provision that actually outlines for the President what the President has to take account of in a cost-benefit analysis. And that statute starts with the words, in determining what action to take under paragraph one dot, dot, dot of this section. So even there, it's not in the provision we're talking about. And the provision that talks about what the President has to take into account is referring back to paragraph one of the section, which is the President's initial action, the overall determination. So we would dispute the trial court's incorrect assumption that 2254 requires some new cost-benefit analysis, certainly not amounting to whatever the President is required to do in the first instance. That's flaw number one. The second flaw in the cost-benefit argument goes back in some ways to this court's decision in Trans-Pacific. The President said that the necessary to make these modifications. Well, this court held in Trans-Pacific that context always includes evident purpose, and evident purpose always includes effectiveness. So that's just buttressing what the trial court found, which is that it's clear from the language that the President had related this back to the cost-benefit determination that he'd made in the first instance and was saying, my safeguard measure is being undermined. It's having a positive effect. There's been positive adjustment, but it's being undermined by this loophole we created and we need to Can I interrupt you and return you to the main issue? Sure. Why isn't it the case that, particularly in light of the existence, where I'm now back at 2254B, particularly in light of the existence of the circumvention provision and what I guess I'm seeing more clearly perhaps than I was when coming in, that it actually makes sense to view all of A1 as about liberalizing measures, including A1B? Why in that circumstance does it not make sense to return back to the very first question here that modification, though plainly on its face, not unidirectional, here is unidirectional? Well, again, modification even in that provision in B is not unidirectional. I want to be clear, the circumvention provision doesn't apply here. Why is that? Because these products were initially within the measure. So it wouldn't be circumvention described generally in trade proceedings, described something that's ostensibly outside the measure, not by an exclusion, but would not have been covered. Your Honor's initial hypothetical is if the President had not covered this initially, then you'd say, oh, this was outside the measure, but there's So you think the circumvention provision would in fact allow for something that would be a phase up? Well, that provision says additional action and not modification. The answer could be yes. No, it can. I don't think it necessarily has to, but it can. This is different, right? What's going on here is I think the important contrast between B1A and B1B. B1A is undoubtedly solely liberalizing. It only allows for reduction in termination. There's a contrast where Congress allowed for something more in B1B, and it doesn't require circumvention. It requires modification consistent with the Supreme Court's view of that term in MCI, a limited change. So what Congress is saying is that we don't know what the circumstances that might come up after the midterm report are, but we are giving the President the authority to make limited changes to the safeguard. Again, context always includes evident purpose, and evident purpose always includes effectiveness. And so the circumstances here- I've come into the argument with the idea, which I think perhaps was not quite right, that at least in the ordinary course, when domestic industry comes in and says, I'd like a change, one would in which case that as a contextual matter would seem to lend a fair bit of support to the idea that modification can mean anti-liberalizing measures. Can you address- and I guess I'm told that view is not a fair picture of the world. Sure. We respectfully disagree with Appellant's would request less protection. It would be the vast, vast minority of the time that the domestic industry is going to come in. And their notion that the idea of has made in B1B refers to a completed action is, I think, lacking on a couple fronts. But even just textually, if Congress said not just termination, but reduction, modification, and termination, and also has a provision that's where after you've taken some reduction, modification, and termination under 2254C, you could then ultimately choose to extend the safeguard. It's clearly not only talking about circumstances where the domestic industry's adjustment has been completed and they just want less relief. The circumstances here clearly demonstrate why that's not going to happen. I think the word termination is appropriate here. Time's up. The case is submitted. Thank you, Your Honor.